# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF LOUISIANA
### MONROE DIVISION

| | |
|---|---|
| **TONGA L ANDERSON** | **CASE NO.  3:20-CV-00832** |
| **VERSUS** | **JUDGE TERRY A. DOUGHTY** |
| **LASALLE MANAGEMENT CO LLC, ET AL.** | **MAG. JUDGE KAYLA D. MCCLUSKY** |

## <u>MEMORANDUM RULING</u>

Pending before the Court is a Motion for Summary Judgment [Doc. No. 42] filed by Defendants LaSalle Management Company, LLC ("LaSalle"), Jackson Parish Sheriff Andy Brown ("the Sheriff" or "Sheriff Brown"), and Tim Ducote ("Ducote") (collectively, "Defendants"). Plaintiff Tonga Anderson ("Anderson") filed a response in opposition [Doc. No. 53], and Defendants filed a reply to Anderson's response [Doc. No. 65].

For the reasons set forth herein, Defendants' Motion is **GRANTED IN PART** and **DENIED IN PART**.

## I.    BACKGROUND

Anderson, a black female, filed the instant suit against Defendants on June 29, 2020.[1] In her complaint, Anderson alleges that Defendants discriminated against her on the basis of her race and sex and later fired her in retaliation because she filed a complaint with the U.S. Equal Employment Opportunity Commission ("EEOC").[2] She seeks punitive and compensatory damages.[3]

---

[1] [Doc. No. 1]
[2] [Id. at ¶¶ 1–27]
[3] [Id. at ¶¶ 29, 31]

The Jackson Parish Correctional Center ("JPCC") hired Anderson in 2009.[4] Ducote, the warden at JPCC, promoted Anderson to Sergeant in her eighth year of employment.[5] While Sergeant, Anderson served as a shift supervisor in the women's dormitory.[6] Originally, Lieutenant Collinsworth ("Collinsworth") supervised Anderson.[7] Lt. Mandy LeBlance ("Mandy") later replaced Collinsworth as the Lieutenant over Anderson.[8]

Mandy currently serves as a patrol deputy under Sheriff Brown's employment.[9] Before her assignment to patrol, Mandy held a supervisory position at JPCC, working for Sheriff Brown.[10] In December of 2019, when the Sheriff took control of two dorms in JPCC, Mandy was appointed as a supervisor.[11] As a supervisor, her responsibilities included ensuring the adherence to daily routines and assisting with headcounts of female inmates in the dorms, if necessary. She reported to Warden Timothy Warden, Chief Deputy Brent Barnett, and the Sheriff.[12]

At all times relevant to the instant case, Ducote was warden at JPCC.[13] As warden, Ducote sat at the top of the chain of command at JPCC. Beneath the warden was a deputy warden, any assistant wardens, then majors.[14] Further down the chain, captains report to majors and lieutenants report to captains.[15] The women's hall had one lieutenant and four sergeants.[16] LaSalle, the management company for JPCC, set pay rates for the facility, and raises were tied to promotions.[17]

---

[4] [Doc. No. 43-6 (Anderson's Deposition), p. 4]
[5] [Id. at p. 7]
[6] [Id.]
[7] [Id. at p. 8]
[8] [Id.]
[9] [Doc. No. 43-10 (Mandy's Deposition), p. 3]
[10] [Id.]
[11] [Id.]
[12] [Id.]
[13] [Doc. No. 43-7 (Ducote's Deposition), p. 6]
[14] [Id. at p. 8]
[15] [Id. at p. 9]
[16] [Id. at p. 13]
[17] [Id.]

During Ducote's tenure as warden, there was no written progressive discipline policy. However, minor infractions would typically result in write-ups, starting with a verbal reprimand that would be documented in the officer's file. With each subsequent write-up, the penalties would escalate.[18] Annual evaluations were not conducted because they were not mandated by the personnel policy established by LaSalle.[19] The JPCC had an anti-nepotism policy in place, ensuring that family members did not supervise one another, and this policy, according to Defendants, was not violated.[20] For example, Defendants maintain that Major Ray Leblance ("Ray"), Mandy's husband, received a specific directive from the Sheriff prohibiting him from supervising his wife.[21]

Sheriff Brown has been sheriff of Jackson Parish since July 1, 2004.[22] Ducote would recommend the termination of certain employees to Sheriff Brown, but the decision to terminate ultimately belonged to the Sheriff.[23]

### A.  The Garcia Incident

Mandy and Anderson were involved an incident that occurred on June 21, 2018, between Mandy and inmate Tabitha Garcia ("Garcia").[24] Anderson's shift was responsible for conducting an inmate count in the dorm where the incident took place.[25] However, when one prisoner was not counted, Mandy and Deputy Betty Pullig ("Pullig") entered the dorm to assist.[26] Although inmates are expected to line up at their bunks during the count, Garcia remained in the shower area.[27]

---

[18] [Id. at p. 22]
[19] [Id. at p. 23]
[20] [Id. at p. 24]
[21] [Id. at p. 25]
[22] [Doc. No. 43-8(Sheriff Brown's Deposition), p. 7]
[23] [Id. at p. 28]
[24] [Doc. No. 43-6, p. 13]
[25] [Id.]
[26] [Id.]
[27] [Id. at p. 14]

Anderson maintains that Garcia requested Mandy to allow her to finish her shower before going to her bunk, but Mandy instructed her to leave the shower.[28]

Anderson testified that Mandy proceeded to slap and choke Garcia because Mandy perceived her as moving too slowly.[29] This incident unfolded while Anderson, Pullig, and Kathryn Mosely ("Mosely") were present in the shower area as well.[30] After the initial contact, a fight ensued between Mandy and Garcia.[31] Anderson believed that Garcia was defending herself during the altercation.[32] Anderson stated that when a Captain entered the shower area, the fight had already ceased, and the Captain sprayed chemical spray on Garcia.[33] Subsequently, the dorm was evacuated, and Anderson followed, although she did not have a clear view of what transpired with Garcia.[34]

Mandy's account of the Garcia incident differs from Anderson's. Mandy testified that she was working in the women's dormitory when she received a call from a control room operator, who informed her that the deputies were facing difficulties in clearing the offender count.[35] Upon entering the dormitory, Mandy instructed all the females to lineup.[36] When she noticed Garcia in the shower, Mandy repeatedly gave direct verbal orders for her to exit, but Garcia responded with profanity.[37] Despite Mandy's multiple instructions, Garcia refused to comply.[38] Mandy took hold of Garcia's towel from the shower wall and approached her, tossing the towel, which Garcia

---

[28] [Id.]
[29] [Id.]
[30] [Id.]
[31] [Id.]
[32] [Id.]
[33] [Id.]
[34] [Id.]
[35] [Doc. No. 43-10, p. 8]
[36] [Id.]
[37] [Id.]
[38] [Id. at pp. 12–13]

initially used to wipe her face.[39] Suddenly, Garcia spat on the side of Mandy's face.[40] In response, Mandy firmly grasped Garcia's arm and guided her to the shower wall near the toilets.[41] Mandy instructed Garcia to wrap herself in the towel, go sit in her bunk, and that once the count was finished, she could return to the shower.[42] Garcia then made a threatening motion, as if she were going to spit on Mandy again. In order to prevent this, Mandy placed her hand on Garcia's neck and gently pushed her head away, urging her to swallow it.[43] Subsequently, Garcia pushed Mandy's hand aside and grabbed her hair. Due to the water on the shower floor, both Mandy and Garcia slipped and fell to the ground. While on the floor, Garcia tightened her legs around Mandy, and Mandy heard Lieutenant Pullig calling for assistance. Mandy observed other officers coming to her aid. One of her fellow officers pulled her away, while the other employed a chemical agent to gain control over Garcia.[44] When Garcia was sprayed, Mandy was standing a few feet away, and Garcia remained on the shower floor, exhibiting combative behavior.

Mandy is unaware of the whereabouts of Pullig, Mosely, or Anderson during the Garcia incident.[45] Mandy believes that neither Mosely nor Anderson provided any assistance during the altercation involving Garcia.[46] Mandy did not take any action to seek disciplinary measures against Anderson for her failure to provide aid.[47]

Following the Garcia incident, Mandy and Anderson attended a meeting with Ray. Mandy recalled Ray emphasizing the importance of teamwork to ensure the safety of everyone involved

---

[39] [Id. at p. 13]
[40] [Id.]
[41] [Id. at pp. 13–14]
[42] [Id. at p. 13]
[43] [Id. at pp. 12–13]
[44] [Id. at p. 12]
[45] [Id. at p. 13]
[46] [Id. at p. 15]
[47] [Id.]

and their return home at the end of each day.[48] Mandy did not actively participate or recall Anderson contributing to the discussion.[49] The meeting with Anderson lasted approximately five to ten minutes.[50] Mandy believes that neither Mosely nor Anderson provided assistance to her during the Garcia incident.[51] After Ray finished speaking, Anderson promptly left the room.[52] Once Anderson exited the room, Mosely entered, and a similar meeting took place.[53]

Ducote testified that on the day of the Garcia incident, Ray addressed the individuals involved in the altercation to discuss training and remind them of their obligation to assist fellow co-workers in need.[54] Ducote stated that this was not a reprimand directed at Anderson.[55] At the time of the incident, Mandy held the position of sergeant in charge of the Work Release program and received appropriate sergeant pay.[56] Ducote reviewed both videos of the incident, which informed his understanding and perspective on the matter.[57] He observed Garcia spitting on Mandy in one of the videos.[58] Ducote stated that if an officer witnesses excessive force being used, it is their duty to intervene and halt the situation.[59] Conversely, if an officer is in need of assistance, it is the responsibility of other officers to provide help and ensure their safety.[60] Pullig intervened in the Garcia incident by assisting in restraining Garcia.[61]

Anderson felt that she was reprimanded for her lack of involvement in the Garcia incident. Anderson testified that she was summoned to Ray's office, where he told her that the staff was like

---

[48] [Id. at pp. 10–11]
[49] [Id. at p. 11]
[50] [Id.]
[51] [Id. at p. 14]
[52] [Id.]
[53] [Id.]
[54] [[Doc. No. 43-7, p. 26]
[55] [Id.]
[56] [Id.]
[57] [Id. at p. 27]
[58] [Id. at p. 68]
[59] [Id. at p. 30]
[60] [Id.]
[61] [Id. at pp. 30–31]

a family and that deputies should support each other during fights.[62] When asked how this discussion was discriminatory, Anderson pointed out that she is a black female and Mandy is a white female.[63] Anderson was asked if she would expect assistance if she was in an altercation with an inmate, and she responded that, regardless of race, she would expect assistance.[64] Furthermore, she testified that the conversation described here was the only disciplinary action she faced regarding the incident.[65]

### 1. Anderson's First EEOC Charge

In response to the Garcia-incident meeting, Anderson filed a charge with the EEOC ("first EEOC charge") claiming that she was discriminated against on the basis of race. In her first EEOC charge, she claimed that the Wardens, Captains, and Mandy violated the Civil Rights Act of 1964 by failing to promote her in a timely manner and failing to give her raises that she should have received.[66] Anderson also claims that her responsibilities under Mandy were different than her responsibilities under Collinsworth because Mandy did not help as much with Anderson's tasks.[67] She also testified that her failure to be promoted was based on race, that others were promoted faster, and that she did not know of any black employees who received promotions.[68] According to Anderson, she was more qualified than others who made lieutenant.[69]

Ducote was contacted by the EEOC inquiring about any response to Anderson's 2018 Charge of Discrimination, and he directed them to LaSalle.[70] He did not provide any information

---

[62] [Doc. No. 43-7]
[63] [Id.]
[64] [Id. at p. 16]
[65] [Id.]
[66] [Doc. Nos. 43-1, pp. 1-2; 53-1, pp. 1-2]
[67] [Doc. No. 43-6, pp. 9–10]
[68] [Id. at p. 12]
[69] [Id.]
[70] [Doc. No. 43-7, p. 33]

to the EEOC regarding the charge and did not discuss it with the Sheriff.[71] Ducote did not personally review the first EEOC charge but rather only had the phone conversation with someone from the EEOC.[72]

The EEOC mailed Anderson a right-to-sue letter on September 25, 2018.[73] Anderson did not file suit relating to the first EEOC charge until June 29, 2020. She also maintains that she is not bringing any actions arising directly from the allegations of the first EEOC charge.[74]

**B.  The Giles Incident**

On January 12, 2019, Anderson was involved in an incident that took place in a lockdown cell with an inmate name Chelsea Giles ("Giles"). Giles was already in a lockdown cell when Anderson's shift began.[75] For two days prior to the incident, Giles was "acting up."[76] According to Anderson, Giles was "acting out" by "cussing and beating on property."[77] Giles began "hollering" around 6:30 a.m., leading to a verbal warning from Anderson.[78] The warning worked for a time, but eventually Giles resumed causing a ruckus.[79] Anderson gave Giles six or seven verbal warnings over a span of three hours before finally stepping into the lockdown cell and pepper spraying Giles.[80]

Before spraying Giles, Anderson opened the cell door and warned her about the impending spray.[81] When asked if she gave Giles time to comply after the warning, Anderson reiterated that Giles was being verbally disruptive and that she would not have sprayed if Giles had not done

---

[71] [Id. at pp. 33–34]
[72] [Id. at p. 36]
[73] [Doc. Nos. 43-1, pp. 1–2; 53-1, pp. 1–2]
[74] [Doc. No. 53-1, p. 13, ¶ 62]
[75] [Id.]
[76] [Doc. No. 43-6, p. 25]
[77] [Id. at p. 26]
[78] [Id. at p. 25]
[79] [Id. at p. 26]
[80] [Id. at p. 27]
[81] [Id. at p. 28]

anything wrong.[82] After spraying Giles and closing the door, Anderson went to the bathroom for fresh air while Giles was taken out of the cell for a shower.[83] Anderson then resumed her normal duties.[84] When questioned later about Giles posing a threat to herself, Anderson, or others, Anderson stated she did not consider Giles a threat.[85] Additionally, Anderson admitted that Giles was not attempting to damage any property when she opened the cell door to spray her.[86]

Anderson testified that she contacted a Captain, the highest-ranking officer on duty, and informed him about Giles's behavior before spraying her.[87] According to Anderson's testimony, the Captain instructed her to spray Giles.[88] Regarding the appropriateness of spraying Giles, Anderson stated that she followed a protocol she learned—not through formal training, but rather by observing while working in the control room on the men's side dorm—of giving three verbal warnings followed by pepper spraying the offender.[89] She could not recall specific instances of others employing the same "three warnings and then spray" approach on the women's side but mentioned witnessing others pepper spraying inmates in a holding cell.[90]

When the incident involving Giles occurred, Ducote presented his recommendation to the Sheriff, who ultimately decided to terminate Anderson.[91] During this process, Ducote expressed his belief to the Sheriff that Anderson had used excessive force.[92] Ducote testified that Giles was

---

[82] [Id.]
[83] [Id.]
[84] [Id. at p. 29]
[85] [Id. at p. 36]
[86] [Id.]
[87] [Id. at p. 30]
[88] [Id.]
[89] [Id.]
[90] [Id. at pp. 30–31]
[91] [Doc. No. 43-7, p. 40]
[92] [Id. at pp. 40–41]

locked in a one-person cell and posed no threat to anyone.[93] Additionally, he mentioned that after reviewing the video, the Sheriff believed Anderson could be arrested for her actions.[94]

As to the significance of providing three verbal commands, Ducote noted that refusing to comply with these commands can lead to a disciplinary charge of aggravated disobedience.[95] However, Ducote stated that committing aggravated disobedience does not justify the use of chemical spray.[96] Ducote's understanding of JPCC policy is that use of chemical spray by an officer is only permissible to protect property and life.[97] Excessive noise alone does not pose a security risk that warrants spraying, unless there is property damage occurring.[98] He further noted that, even if an order to spray is given, it could still be considered improper and unlawful.[99] He could not recall how he first learned about the Giles incident, but his first contact was Brazzel.[100]

Sheriff Brown was also questioned about the justification of "three verbal warnings." He stated that it was not an established policy.[101] The Sheriff recalled the Giles incident with Warden Ducote before reaching the decision to terminate Anderson. He stated that Ducote visited his office and the presented the incident video.[102] According to Sheriff Brown, Anderson's termination was solely based on the incident involving Giles.[103] Although he could not recall if there was any prior interaction between Anderson and Giles before the spraying, he testified that such knowledge would not likely change his stance on the situation.[104] After watching the video, he resolved to

---

93 [Id. at p. 41]
94 [Id. at p. 55]
95 [Id. at p. 41]
96 [Id.]
97 [Id. at p. 42]
98 [Id. at p. 43]
99 [Id. at p. 44]
100 [Id. at p. 51]
101 [Doc. No. 43-7, p. 20]
102 [Id. at pp. 22–23]
103 [Id. at p. 34]
104 [Id. at pp. 25–26]

terminate Anderson.[105] While Warden Ducote recommended termination, the ultimate decision rested with Sheriff Brown.[106]

On the following Monday after Anderson sprayed Giles, Mandy received a phone call from either Warden Ducote or Brazzel, requesting her presence to view the recorded footage of the incident. Upon watching the video, they engaged in a discussion acknowledging that Anderson's use of force on Giles was unwarranted and unjustified.[107] However, Mandy testified that she never had any conversations with Sheriff Brown regarding the termination of Anderson.[108]

Anderson was terminated shortly following the Giles incident.[109] In her declaration, Anderson claims that Ducote told her she would be rehired.[110] On May 3, 2019, Anderson filed another EEOC charge ("second EEOC charge"), alleging that Defendants terminated her in retaliation to her filing of the first EEOC charge.[111] The second EEOC charge did not contain allegations of discrimination based on race or sex and instead checked only the box for "retaliation."[112]

In the instant Motion, Defendants argue that any claim relating to the first EEOC charge is untimely because the second EEOC charge does not contain the same allegations levied in the first EEOC charge. Defendants also argue that Anderson's claims relating to the second EOC charge for retaliation lack merit. In response, Anderson maintains that the applicable statute of limitations

---

[105] [Id. at p. 28]
[106] [Id. at p. 28]
[107] [Doc. No. 43-10, p. 26]
[108] [Id. at p. 28]
[109] [Doc. No. 43-4]
[110] [Doc. No. 53-2, p.7]
[111] [Id.]
[112] [*See* Doc. No. 43-4 (second EEOC charge) where Anderson described the particulars as follows: "In September 2018, I filed an EEOC Charge against the company. After filing the Charge, I was subjected to retaliation and was discharged on January 17, 2019. During my unemployment hearing, I learned that after I filed the EEOC Charge, I had multiple write ups placed in my file that I had no knowledge of. According to the company, I was discharged for spraying an inmate with pepper spray. I followed policy and industry practice when I sprayed the inmate. I believe I have been retaliated against for filing EEOC Charge 846-2018-23165 in violation of Title VII of the Civil Rights Act of 1984, as amended. Other employees have sprayed inmates and have not been discharged."]

is four years and that there are genuine issues of material fact as to all of her claims, precluding summary judgment.

## II.    LAW AND ANALYSIS

### A.  Standard of Review

Under Federal Rule of Civil Procedure 56(a):

> [a] party may move for summary judgment, identifying each claim or defense--or the part of each claim or defense--on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.  The court should state on the record the reasons for granting or denying the motion.

Fed. R. Civ. P. 56(a). Further, "[i]f the moving party meets the initial burden of showing there is no genuine issue of material fact, the burden shifts to the nonmoving party to produce evidence or designate specific facts showing the existence of a genuine issue for trial." *Distribuidora Mari Jose, S.A. de C.V. v. Transmaritime, Inc.*, 738 F.3d 703, 706 (5th Cir. 2013) (internal quotation marks and citation omitted); *see also* FED. R. CIV. P. 56(c)(1).

A fact is "material" if proof of its existence or nonexistence would affect the outcome of the lawsuit under applicable law in the case.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).  A dispute about a material fact is "genuine" if the evidence is such that a reasonable fact finder could render a verdict for the nonmoving party. *Id.*

"[A] party cannot defeat summary judgment with conclusory allegations, unsubstantiated assertions, or only a scintilla of evidence." *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007) (*citing Anderson*, 477 U.S. at 248). However, in evaluating the evidence tendered by the parties, the Court must accept the evidence of the nonmovant as credible and draw all justifiable inferences in its favor. *Anderson*, 477 U.S. at 255. "A non-conclusory affidavit can create genuine issues of material fact that preclude summary judgment, even if the affidavit is self-

12

serving and uncorroborated." *Lester v. Wells Fargo Bank, N.A.*, 805 F. App'x 288, 291 (5th Cir. 2020) (citations omitted).

Note that "a district court has somewhat greater discretion to consider what weight it will accord the evidence in a bench trial than in a jury trial." *Matter of Placid Oil Co.*, 932 F.2d 394, 397 (5th Cir. 1991); *see also Nunez v. Superior Oil Co.*, 572 F.2d 1119, 1124 (5th Cir. 1978) ("If decision is to be reached by the court, and there are no issues of witness credibility, the court may conclude on the basis of the affidavits, depositions, and stipulations before it, that there are no genuine issues of material fact, even though decision may depend on inferences to be drawn from what has been incontrovertibly proved . . . . The judge, as trier of fact, is in a position to and ought to draw his inferences without resort to the expense of trial.").

### B. Analysis

Defendants argue that Anderson's claims for discrimination brought in relation to her first EEOC charge and her claims against Ducote in his personal capacity are not properly before the Court. In response, Anderson argues that she filed suit on June 29, 2020, for claims arising under 42 U.S.C. § 1981, that Section 1981 provides for claims arising out of her first EEOC charge, and that Section 1981 has a four-year statute of limitations.[113] Anderson also maintains that she is not bringing any actions arising directly from the allegations of her first EEOC charge.

Defendants next argue that Anderson's retaliation claims fail because she cannot establish a prima facie case of retaliation under Title VII. Alternatively, Defendants maintain that Anderson cannot establish a causal link between Anderson's first EEOC charge and her firing and that Anderson cannot establish that her reasons for firing were pretextual. In response, Anderson argues

---

[113] [Doc. No. 53-1, pp. 3, 5, 13]

that she has established a prima facie case, a causal link, and that the given reasons for her suffered adverse-employment actions were pretextual.

Next, Defendants raise numerous arguments that Anderson's claims under state law, her claim for punitive damages, and her claim for attorney's fees and costs should be dismissed and why each claim must be dismissed. In response, Anderson maintains that she has a valid claim for punitive damages because Defendants knowingly violated federal law and that her state law claims survive because they are based on the same foundation as her claims under federal law.

The Court agrees with many of Defendants' arguments. However, the Court finds that Anderson's claim for retaliation survives because she can establish that a prima facie case for retaliation under Title VII exists. The Court also finds that genuine issues of material fact exist as to the causal link between her suffered adverse employment action and her first EEOC charge. Finally, the Court also finds that Anderson has demonstrated a genuine issue of material fact as to whether her firing was mere pretext for unlawful retaliation. Each argument will be addressed in turn below.

### 1. Claims Properly Before the Court

Defendants argue that Anderson's retaliation claims are the only claims properly before the Court.[114] Specifically, they contend that the discrimination claims, contained only within the first EEOC charge, must be dismissed because Anderson failed to file suit within ninety (90) days of her receipt of the notice of right to sue.[115] Defendants further contend that claims against Ducote must be dismissed because Anderson failed to name him in either of her EEOC charges and because there is no individual liability under Title VII.[116] Anderson's response does not address

---

[114] [Doc. No. 43, pp. 48–50]
[115] [Id. at pp. 48–50 (*citing Stokes v. Dolgencorp, Inc.*, 367 F. App'x 545, 547–48 (5th Cir. 2010) (citations omitted); *Gomez v. Orleans Par. Sch. Bd.*, No. CIV.A.04-1521, 2005 WL 2050285, at *5 (E.D. La. Aug. 11, 2005))]
[116] [Id. at pp. 42–43 (citing *Ajaz v. Continental Airlines*, 156 F.R.D. 145, 147 (S.D. Tx. 1994))]

these arguments directly. Instead, she maintains that Section 1981 has a four-year statute of limitations and that she is not bringing claims directly relating to her first EEOC charge. The Court will address these arguments below.

### a. Exhaustion of Available Administrative Remedies.

Before an individual can pursue a Title VII claim in federal court, she must first exhaust her available administrative remedies. *Hall v. Cont'l Airlines, Inc.*, 252 F. App'x 650, 653 (5th Cir. 2007) (referencing *Taylor v. Books A Million, Inc.*, 296 F.3d 376, 378–79 (5th Cir. 2002). Exhaustion occurs when an individual "files a timely complaint with the EEOC, her claim is dismissed by that agency, and the agency informs her of her right to sue in federal court." *Id.* Title VII claims must be filed within ninety (90) days of a plaintiff's receipt of the notice of right to sue letter or the action will be dismissed; this ninety-day statutory period is strictly construed. *Id.*; *see also Stokes v. Dolgencorp, Inc.*, 367 F. App'x 545, 547–48 (5th Cir. 2010) (*citing* 42 U.S.C. § 2000e–5(f)(1)); (*Taylor*, 296 F.3d at 379*), cert. denied*, 537 U.S. 1200, (2003). Further, the ninety-day period commences "on the date the EEOC right-to-sue is delivered to the offices of formally designated counsel or the claimant," and when a plaintiff does not assert a specific date upon which she received notice of the right to sue, courts assume she received it between three and seven days after it was mailed. *Stokes*, 367 F. App'x at 547–8 (*quoting Ringgold v. Nat'l Maint. Corp.*, 796 F.2d 769, 770 (5th Cir. 1986) (*citing Taylor*, 296 F.3d at 379)).

In *Gomez v. Orleans Par. Sch. Bd.*, No. CIV.A.04-1521, 2005 WL 2050285 (E.D. La. Aug. 11, 2005), the court dealt with a situation much like the instant case. There, the plaintiff filed an initial EEOC charge claiming discrimination, received a right-to-sue letter, but did not file suit. *Id.* at 5. Subsequently, the plaintiff filed a second EEOC charge claiming that her employer retaliated against her because of the first charge. *Id.* The court noted that a Title VII plaintiff generally may not bring claims in a lawsuit that were not included within the EEOC charge. *Id.* (referencing

*Auston v. Schubnell*, 116 F.3d 251, 254 (5th Cir. 1997) (barring retaliation claim because plaintiff "did not check the retaliation box on the charge form, nor did his account of the facts include any reference at all to retaliatory conduct"); *see also Cargo v. Kansas City S.*, No. CIV.A. 05-2010, 2009 WL 3010824 (W.D. La. Sept. 16, 2009) ("Because claims of hostile work environment, retaliation, and sex discrimination would not ordinarily be expected to grow out of a reasonable investigation of Anderson's charge, the Court finds [plaintiff] failed to exhaust her administrative remedies with respect to her Title VII claims of hostile work environment, retaliation, and sex discrimination."). The court noted that on the second EEOC charge, "plaintiff only checked the box marked 'Retaliation,' leaving the 'Race' and the 'Other' boxes empty on the EEOC charge form, and that her factual statement made no reference to the discriminatory conduct mentioned in her complaint. *Id.* at 5–6. Against that factual backdrop, the court found that only the retaliation claim was properly before it.

Here, Anderson filed her first EEOC charge on or about August 24, 2018, and the EEOC mailed her right-to-sue letter on September 25, 2018.[117] Accordingly, she had until January of 2019 to file suit related to the first EEOC charge. Anderson filed the instant suit on June 29, 2020, well after the first EEOC charge's ninety-day period expired. Further, Anderson's second EEOC charge checked only the box for retaliation and makes no mention of a delay in her promotion to sergeant, failure to be promoted to lieutenant, or any discrimination related to her participation in the above-discussed incidents.[118] Additionally, Anderson does not attempt to argue that her second

---

[117] [Doc. Nos. 43-1, pp. 1–2; 53-1, pp. 1–2]

[118] [*See* Doc. No. 43-4 (second EEOC charge) where Anderson described the particulars as follows: "In September 2018, I filed an EEOC Charge against the company. After filing the Charge, I was subjected to retaliation and was discharged on January 17, 2019. During my unemployment hearing, I learned that after I filed the EEOC Charge, I had multiple write ups placed in my file that I had no knowledge of. According to the company, I was discharged for spraying an inmate with pepper spray. I followed policy and industry practice when I sprayed the inmate. I believe I have been retaliated against for filing EEOC Charge 846-2018-23165 in violation of Title VII of the Civil Rights Act of 1984, as amended. Other employees have sprayed inmates and have not been discharged."]

EEOC charge relates back to, arises out of, or encompasses her first EEOC charge. Much to the contrary, Anderson candidly states that she "is not brining any actions arising directly from the allegations of the August 24, 2018 EEOC Charge."[119] The second EEOC charge also listed September 29, 2018 to January 17, 2019 (the date upon which she filed her first EEOC charge and the date of her termination, respectively), as the dates during which the discrimination took place.[120] Anderson failed to file suit in response to her initial EEOC charge within the ninety-day period, and the second EEOC charge makes no reference to the discrimination claims levied in the initial EEOC charge. Thus, Anderson's claims for racial discrimination relating to her first EEOC charge under Title VII are not properly before the Court.

The Complaint also alleges claims under Louisiana state law against Defendants for failing to pay her equal wages, tolerating a racially and sexually hostile work environment, treating her differently from white and male employees, and failing to promote her.[121] In Louisiana, the state law that addresses employment discrimination claims is La. Stat. Ann. § 23:301, also known as the Louisiana Employment Discrimination Law ("LEDL"). The LEDL is similar to the federal Title VII of the Civil Rights Act of 1964 in that it prohibits employment discrimination based on various protected characteristics. *See Rodrigue v. PTS Mgmt. Grp., LLC*, 550 F. Supp. 3d 376, 392 (W.D. La. 2021) ("[C]laims under the LEDL are governed by the same analysis as that for claims under Title VII."). The LEDL provides a prescriptive period of one year from the time of the alleged discrimination. La. Stat. Ann. § 23:303(D). However, the prescriptive period is suspended for up to six months during the pendency of any administrative review or investigation of a claim conducted by the EEOC. *Id.*

---

[119] [Doc. No. 53-1, p. 13, ¶ 62]
[120] [Id.]
[121] [Doc. No. 1, ¶ 28]

Here, Anderson claims that the meeting with Ray, which occurred following the Garcia incident on June 18, 2018, prompted her to file her first EEOC charge.[122] Anderson filed her first EEOC charge on August 24, 2018, sixty-seven days after the meeting with Ray. The EEOC issued Anderson's right-to-sue letter thirty-one days later, on September 25, 2018. Applying the typical presumption of three to seven days from mailing for receipt, the prescriptive period resumed on October 2, 2018. Accordingly, Anderson had until July 27, 2019, to file suit relating to her first EEOC charge. She filed suit on June 29, 2020. Therefore, Anderson's claims relating to the first EEOC charge prescribed before she filed suit, and therefore she may not now bring those claims.

Anderson argues that Section 1981 has a four-year prescriptive period.[123] This statement is partially true, but nonetheless, it is unpersuasive. In actions arising under federal statutes enacted after December 1, 1990, courts must apply a catchall four-year statute of limitations. *Willis v. Cleco Corp.*, 927 F. Supp. 2d 372, 377 (W.D. La. 2013) (*citing* 28 U.S.C. § 1658 ("Except as otherwise provided by law, a civil action arising under an Act of Congress enacted after the date of the enactment of this section may not be commenced later than 4 years after the cause of action accrues.")). Congress amended Section 1981 in 1991, and the Supreme Court of the United States has recognized that the 1991 revisions qualify as an "Act of Congress." *Jones v. R.R. Donnelley & Sons Co.*, 541 U.S. 369, 370 (2004). Accordingly, actions made possible by the 1991 revisions to Section 1981 are subject to a four-year statute of limitations. *Id.*; *see also Balakrishnan v. Bd. of Sup'rs of Louisiana State Univ. & Agr. & Mech. Coll.*, No. CIV.A. 08-4315, 2009 WL 2175974, at *7 (E.D. La. July 21, 2009) ("Because this cause of action was 'made possible' by the 1991 revisions to § 1981, the four-year statute of limitations applies.").

---

[122] [Doc. Nos. 43-1, p. 11; 43-6, p. 15]
[123] [Doc. No. 53-1, pp. 3, 5, 13]

Here, even assuming they are subject to a four-year statute of limitations, Anderson's claims arising from the first EEOC charge must be dismissed. As discussed above, Anderson did not file suit within the applicable ninety-day period and her second EEOC charge did not reference her first. The first EEOC charge, at most, paused the tolling of the statute of limitations, and the application of an extended four-year statute of limitations does not cure Anderson's failure to timely file suit after receiving her right-to-sue letter. Further, the LEDL—a Louisiana state statute—explicitly provides a one-year prescriptive period, and claims arising out of Anderson's first EEOC charge prescribed well before Anderson filed this suit. Thus, any claim in this suit arising from Anderson's first EEOC charge is untimely and not properly before the Court.

Accordingly, Anderson's claims for race discrimination and conspiracy brought against Defendants arising out of her first EEOC charge are hereby **DISMISSED WITH PREJUDICE**.

### b. Anderson's Claims Against Ducote.

Defendants argue that Anderson's claims against Ducote in his personal capacity are not properly before the Court. Anderson does not respond to this argument.

In *Ajaz v. Continental Airlines*, 156 F.R.D. 145, 147 (S.D. Tx. 1994), the court found that because the defendant had not been named as a respondent in the charge at issue or otherwise implicated by that charge, the plaintiff did not have a valid claim against the defendant. There, the court noted the purpose of an EEOC charge, stating:

> The primary purpose of an EEOC charge is to provide notice of the charges to the respondent and to activate the voluntary compliance and conciliation functions of the EEOC…. The reasonable limits of the investigation potentially triggered by an EEOC charge define not only the substantive limits of a subsequent Title VII action, but also the parties potentially liable for any violation found.

*Id.* The court further noted that "the Fifth Circuit has made it clear that Title VII does not permit the imposition of [personal] liability" on individuals, but rather only considers official conduct through the lens of vicarious liability against the employer. *Id.* at 148.

Here, neither of the two EEOC charges name, mention, or otherwise implicate Ducote. Therefore, Ducote is not—in his personal capacity—a proper party to the instant suit. Further, at the time of the charges, Ducote was acting warden of JPCC and made employment decisions in his official capacity as warden. Any claims against him personally or in his individual capacity must be dismissed.

Accordingly, any claims brought by Anderson for discrimination, retaliation, or otherwise brought under Title VII against Ducote in his individual capacity are hereby **DISMISSED WITH PREJUDICE**.

## 2.  Retaliation Claims Under Title VII.

Although the Court finds that Anderson's discrimination claims must be dismissed, the success of her retaliation claim can be separate and independent of the success of her discrimination claims. Title VII prohibits retaliation by an employer "against an employee for making a charge or otherwise participating in a Title VII proceeding." *Nilsson v. City of Mesa*, 503 F.3d 947, 953 (9th Cir. 2007) (*citing* 42 U.S.C. § 2000e–3). Anderson claims that Defendants retaliated against her for filing the first EEOC charge.

Title VII retaliation claims based on circumstantial evidence are analyzed under the *McDonnell Douglas* burden-shifting framework. *McMillan v. Rust College, Inc.*, 710 F.2d 1112, 1116 (5th Cir. 1983) (holding that the burden-shifting structure set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–804 (1973), applies to Title VII retaliation cases). Under this framework, the order and allocation of proof begins with Anderson, who has the initial burden of establishing a prima facie case of retaliation. *Id.* To satisfy this burden, Anderson must show that:

20

(1) she engaged in activity protected by Title VII; (2) she suffered an adverse employment action by Defendants; and (3) a causal connection exists between the protected activity and the adverse employment action. *See Davis v. Fort Bend Cnty.*, 765 F.3d 480, 489 (5th Cir. 2014). If Anderson cannot support all three elements of a prima facie case of retaliation, then summary judgment for Defendants is appropriate. *See Stewart v. Miss. Transp. Comm'n.*, 586 F.3d 321, 331 (5th Cir. 2009).

However, if Anderson successfully establishes a prima facie case, the burden then shifts to Defendants to produce a legitimate, nonretaliatory reason for the adverse employment action. *Davis*, 480 F.3d at 490. If Defendants make this showing, the burden shifts back to Anderson to prove that Defendants' proffered reason is actually pretext for retaliation. *Id*. An employee establishes pretext by proving that "but for" the protected activity, he would not have suffered the employment actions of which he complaints. *See Univ. of Tex. Southwestern Med. Ctr. v. Nassar*, 570 U.S. 338, 362 (2013). While this final step may seem identical to the causal connection prong of the prima facie case, the burden required to prove causation at this stage is more stringent. Indeed, "[t]he ultimate determination in an unlawful retaliation case is whether the conduct protected by Title VII was a 'but for' cause of the adverse employment decision." *Long v. Eastfield Coll.*, 88 F.3d 300, 305 n.4 (5th Cir. 1996).

### a.  *Prima Facie* Case for Retaliation.

Here, Anderson engaged in a protected activity when she filed her first EEOC charge. Further, Anderson suffered an adverse employment action when she was terminated on January 17, 2019. Therefore, the first two elements of a prima facie case for retaliation are satisfied.

  **b. Causal Link Between Protected Activity and Adverse Employment Action.**

   In *Mooney v. Lafayette Cnty. Sch. Dist.*, 538, Fed. App'x 447, 454 (5th Cir. 2013), the court noted that temporal proximity is a common method to establish a causal link between engaging in a protected activity and an adverse employment action, stating "[c]lose timing between an employee's protected activity and an adverse employment action can be a sufficient basis for a court to find a causal connection required to make out a prima facie case of retaliation." Further, courts have noted that "a time lapse of up to four months has been found sufficient to satisfy the causal connection for summary judgment purposes." *Evans v. City of Houston*, 246 F.3d 344, 354 (5th Cir. 2001); *see also Savage v. LaSalle Mgmt. Co.*, No. 3:21-CV-02253, 2022 WL 2962957 (W.D. La. July 11, 2022), *report and recommendation adopted,* No. 3:21-CV-02253, 2022 WL 2955152 (W.D. La. July 26, 2022) ("Finally, the Court can reasonably infer that there is a causal connection between Plaintiff's EEOC charge and his subsequent transfer to Winn Correctional Center because the transfer occurred only five months after Plaintiff filed his charge."); *McCoy v. City of Shreveport*, 492 F.3d 551, 562 (5th Cir. 2007) ("Close timing between an employee's protected activity and an adverse action against him may provide the 'causal connection' required to make out a prima facie case of retaliation.") (internal quotations and citation omitted).

   Here, Anderson filed her first EEOC charge on or about August 24, 2018, and Sheriff Brown received it on September 13, 2018.[124] Anderson was discharged roughly 127 days (or slightly less than 4.25 months) after Sheriff Brown received notice of her first EEOC charge. Sheriff Brown had the authority to make the hiring and firing decisions at JPCC.[125] This temporal proximity is close enough to establish a causal link between Anderson filing her initial EEOC

---

[124] [Doc. Nos. 43-2, 43-8]
[125] *Supra*, n. 22.

charge and her termination. Therefore, Anderson has satisfied her burden of proving a prima facie case for retaliation.

### c.  Legitimate, Nonretaliatory Reason for Termination and Pretext.

As indicated above, because Anderson successfully established a prima facie case, the burden then shifts to Defendants to produce a legitimate, nonretaliatory reason for the adverse employment action. *Davis*, 765 F.3d at 490. Here, Sheriff Brown testified that he terminated and ultimately declined to rehire Anderson because he determined that Anderson used excessive force during the Giles incident.[126] This is a legitimate, nonretaliatory reason to fire Anderson.

Once Defendants make this showing, the burden shifts back to Anderson to prove that Defendants' proffered reason is merely pretext for retaliation. *Id*. Defendants argue that Anderson must prove her claim "according to traditional principles of 'but for' causation and carry her burden of demonstrating that [Defendants'] proffered non-discriminatory reason is pretextual"; that "to survive a motion for summary judgment, the plaintiff must show a 'conflict in substantial evidence' on this issue"; and that, although "suspicious timing with other sufficient evidence of pretext can be sufficient to survive summary judgment," Anderson has no evidence of pretext at all.[127] Defendants' formulation of the pretextual standard is correct, but they fail to mention the ample evidence of pretext Anderson could provide at trial.

Anderson presents evidence of pretext in several ways. First, the offense cited is not always a terminable offense at JPCC. For example, Robert Anderson was found to have used chemical spray unreasonably but was only suspended and eventually promoted to lieutenant.[128] The "inconsistent treatment of [a plaintiff] raises disputed issues of material fact as to whether[] but

---

[126] [Doc. No. 43-8, p. 89]
[127] [Doc. No. 43, p. 47 (*citing Saketkoo v. Administrators of Tulane Educational Fund*, 31 F. 4th 990, 1002 (5th Cir. 2022))].
[128] [Doc. No. 53, p. 15 (*citing* Doc. Nos. 53-13, 53-14, and 43-11)].

for exercising her rights she would have been discharged." *Wheat v. Fla. Par. Juvenile Justice Comm'n*, 811 F.3d 702, 711 (5th Cir. 2016). Moreover, a "plaintiff may establish pretext by showing that a discriminatory motive more likely motivated her employer's decision, such as through evidence of disparate treatment, or that her employer's explanation is unworthy of credence." *Haire v. Bd. of Supervisors of La. State Univ. Agric. & Mech. Coll.*, 719 F.3d 356, 363 (5th Cir. 2013).

The declaration of Tiffany Hicks ("Hicks"), an employee at JPCC during Anderson's tenure, also demonstrates an issue of fact as to whether Anderson, who claims to have followed her training by giving three warnings before spraying an offender, was justified in spraying Giles. Hicks also testified that there was "an air of retaliation" at JPCC, that complainers were treated as a problem, and that Sheriff Brown on at least one occasion allegedly threatened the discharge of employees who complained about race discrimination.[129] Finally, Ducote, who regularly makes suggestions to Sheriff Brown on hiring/firing decisions, contradicted the stated reason for Anderson's termination when he told Anderson that she would be rehired.[130]

Considering the timing of her firing, the contradiction in the reason for her termination, and the possibility that JPCC applied its policy against Anderson but not against other similarly situated employees, the Court concludes that taking evidence in its totality and in the light most favorable to Anderson creates a genuine issue of material fact.

Accordingly, Defendants' Motion for Summary Judgment is **DENIED IN PART** to the extent it seeks to dismiss Anderson's retaliation claims.

---

[129] [Id. at p. 16 (referencing Doc. Nos 53-5 and 53-7)]
[130] [Doc. No. 53-2]

24

### 3. State Law Tort Claims

Defendants argue that Anderson's state law claims for intentional inflection of emotional distress ("IIED") fail because the conduct at issue does not rise to the level of "extreme and outrageous" conduct.[131] Anderson does not respond to this argument directly but asserts that because her "federal claims survive, so should her Louisiana state law claims since they rest on the same foundation."[132] The Court will examine each argument below.

A plaintiff seeking to recover for IIED must establish:

> (1) that the conduct of the defendant was extreme and outrageous; (2) that the emotional distress suffered by the plaintiff was severe; and (3) that the defendant desired to inflict severe emotional distress or knew that severe emotional distress would be certain or substantially certain to result from his conduct.

> The conduct must be so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community. Liability does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities. Persons must necessarily be expected to be hardened to a certain amount of rough language, and to occasional acts that are definitely inconsiderate and unkind.

*King v. Phelps Dunbar, L.L.P.*, 98-1805 (La. 6/4/99), 743 So. 2d 181, 185–86 (internal citations omitted).

Here, Anderson has failed to create a genuine issue of material fact as to the merits of her IIED claims. She has presented no evidence demonstrating extreme or outrageous conduct nor any evidence that she suffered severe emotional distress. Each alleged instance of adverse employment action is mundane and relatively typical of the workplace. There is nothing "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency," about an

---

[131] [Doc. No. 43, pp 64–65]
[132] [Doc. No. 53, p. 25]

after-action meeting to reiterate that all co-workers should look out for each other. Neither is there anything extreme nor outrageous about an employee not getting a desired promotion or not getting a promotion on her preferred schedule. Similarly, termination (and refusal to rehire) because of a potential violation of policy does not go beyond the bounds of decency.

Further, her argument that state-law claims must survive because they are based on the same set of facts as her federal-law claims is unpersuasive. Claims for IIED have a different standard and different set of elements compared to claims for retaliation/discrimination under Title VII. Additionally, as discussed above, Anderson's federal claim for discrimination relating to her first EEOC charge do not survive.

Accordingly, Anderson's claim for IIED is hereby **DISMISSED WITH PREJUDICE**.

### 4.  Punitive Damages

Anderson also seeks punitive damages.[133] There is a higher burden for punitive damages than compensatory damages with respect to Title VII claims. In *Henry v. CorpCar Services Houston, Ltd.*, 625 Fed. Appx. 607, 614 (5th Cir. 2015), the United States Court of Appeals for the Fifth Circuit noted the burden for punitive damages, stating:

> Under Title VII, punitive damages are recoverable only if the employer engaged in a discriminatory practice ... with malice or with reckless indifference to [an employee's] federally protected rights. The terms "malice" or "reckless indifference" pertain to the employer's knowledge that it may be acting in violation of federal law, not its awareness that it is engaging in discrimination. Malice has been described as "evil motive or intent," and reckless indifference has been described as "a 'subjective consciousness' of a risk of injury or illegality and a 'criminal indifference to civil obligations.'"

*Id.* (internal citations omitted). In support of her claim for punitive damages, Anderson argues that "[a]s to Andy Brown, the evidence of reckless indifference is that under the retaliation claim, there

---

[133] *See* [Doc. No. 1]

was no investigation of Anderson's August EEOC Charge nor any consideration that Mandy LeBlance used excessive force in June 2018 and October 2018."[134] Anderson also maintains that at least one supervisor at JPCC threatened to fire employees who talked about discriminatory working conditions. As to Sheriff Brown, Anderson argues that there is little doubt that he was aware of federal law prohibiting discharge based on retaliation.

Here, Anderson's arguments and evidence presented concerning pretext, malice, and reckless indifference are sufficient to create a genuine issue of material fact as to whether she may be entitled to punitive damages.

Accordingly, Defendants' Motion for Summary Judgment is **DENIED IN PART** to the extent it seeks to dismiss Anderson's claims for punitive damages arising out of her retaliation claims.

### 5. Attorney's Fees and Costs

Anderson also seeks recovery of attorney's fees and costs. In *Carter v. Luminant Power Servs. Co.*, 714 F.3d 268 (5th Cir. 2013), the Fifth Circuit addressed the issue of whether plaintiffs could recover attorney's fees for mixed-motive retaliation claims under Title VII of the Civil Rights Act of 1964. The court held that plaintiffs were not entitled to attorney's fees for mixed-motive retaliation claims under Title VII. *Id.* at 271. The court's decision was based on the interpretation of the Civil Rights Act of 1991, which amended Title VII to allow for the recovery of attorney's fees for claims of intentional discrimination based on race, color, religion, sex, or national origin. *Id.* at 271–274. The court reasoned that the language of the Civil Rights Act of 1991 was explicit in providing attorney's fees only for intentional discrimination claims, rather than mixed-motive

---

[134] [Doc. No. 53, p. 32]

claims. *Id.* The court highlighted that the Act's attorney's fees provision did not encompass retaliation claims, let alone mixed-motive retaliation claims.

Here, Anderson claims that she was retaliated against solely because of her first EEOC complaint. Therefore, because plaintiffs are not entitled to attorney's fees for retaliation claims, and only Anderson's retaliation claims are properly before the Court, her claim for attorney's fees fails.

Accordingly, Anderson's claim for attorney's fees and costs relating to her remaining retaliation claim is hereby **DISMISSED WITH PREJUDICE**.

### III.    CONCLUSION

For the reasons set forth herein,

**IT IS ORDERED, ADJUDGED, AND DECREED** that Defendants' Motion for Summary Judgment is **GRANTED IN PART** and **DENIED IN PART**. The Motion is **GRANTED IN PART**, and Anderson's claims for discrimination, failure to promote, and/or any other claims arising out of her EEOC charge filed on June 18, 2018, are hereby **DISMISSED WITH PREJUDICE**.

**IT IS FURTHER ORDERED, ADJUDGED, AND DECREED** that Defendant's Motion for Summary Judgment is **GRANTED IN PART**, and Anderson's claims for discrimination or retaliation arising under Title VII or the LEDL against Ducote in his individual capacity are hereby **DISMISSED WITH PREJUDICE**.

**IT IS FURTHER ORDERED** that Defendants' Motion for Summary Judgment is **DENIED IN PART** to the extent it seeks to dismiss Anderson's retaliation claims.

**IT IS FURTHER ORDERED, ADJUDGED, AND DECREED** that Defendants' Motion for Summary Judgment is **GRANTED IN PART**, and Anderson's claim for IIED is hereby **DISMISSED WITH PREJUDICE**.

**IT IS FURTHER ORDERED** that Defendants' Motion for Summary Judgment is **DENIED IN PART** to the extent it seeks to dismiss Anderson's claims for punitive damages arising out of her retaliation claims.

**IT IS FURTHER ORDERED, ADJUDGED, AND DECREED** that Defendants' Motion for Summary Judgment is **GRANTED IN PART**, and Anderson's claim for attorneys' fees and costs relating to her remaining retaliation claim is hereby **DISMISSED WITH PREJUDICE**.

MONROE, LOUISIANA, this 12th day of June, 2023.

_____
Terry A. Doughty
United States District Judge